**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| **RAMONA Y EDWARDS** | **CASE NO.  6:21-CV-04206** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **COMMISSIONER OF SOCIAL SECURITY** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

Claimant, Ramona Yvette Edwards, fully exhausted her administrative remedies before filing this action in federal court. She filed an application for disability insurance benefits, alleging disability beginning on September 25, 2014. (Rec. Doc. 9-1, p. 361). Her application was denied. She then requested a hearing, which was held on August 22, 2019, before Administrative Law Judge Carolyn Smilie. (Rec. Doc. 9-1, p. 84-103). The ALJ issued a decision on October 2, 2019, concluding that Claimant was not disabled within the meaning of the Social Security Act. (Rec. Doc. 9-1, p. 173-79). Claimant appealed to the Appeals Council, and the

Appeals Council remanded the matter to the ALJ for an evaluation of Claimant's mental impairment and further consideration of Claimant's residual functional capacity. (Rec. Doc. 9-1, p. 188-89). The ALJ conducted a second hearing on March 11, 2021 and issued another ruling on April 20, 2021. (Rec. Doc. 9-1, p. 104-128; 25-37). Claimant appealed the second ruling to the Appeals Council, which found no basis for review. (Rec. Doc. 9-1, p. 9-12). Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review. *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005). Claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Claimant was born on February 27, 1967. She was 47 years old on the alleged disability onset date and 54 years old at the time of the ALJ's decision. She has a high school diploma and a college degree. (Rec. Doc. 9-1, p. 90). Her employment history includes primarily working as an administrative assistant and clerical employee who sat most of the time. (Rec. Doc. 9-1, p. 90-93). She alleged that she has been disabled since September 25, 2014, due to back pain, at which point her doctor told her to stop working. (Rec. Doc. 9-1, p. 93-94). She has had three back surgeries, which she testified did not alleviate her symptoms. (Rec. Doc. 9-1, p. 94-95). In addition to back pain, she suffers from neck pain, which has caused her to

fall multiple times, and she was hospitalized for supraventricular tachycardia and has heart failure. (Rec. Doc. 9-1, p. 96-97).

At the hearing on remand, Claimant testified that she suffered from depression and insomnia prior to the date last insured in 2017. She sought treatment with the VA for these issues. She does not watch certain TV shows which could cause flashbacks, particularly anything involving sexual assault. She was diagnosed with MST (military sexual assault) after an incident when she was on tour in Honduras in the 1990s. (Rec. Doc. 9-1, p. 115-19).

The medical records in the record establish the following pertinent history:

- VA records indicate that Claimant suffered a right shoulder injury while doing push-ups during basic training in 1988. It got progressively worse, and she was diagnosed with a rotator cuff tear; however, a March 2011 surgery found instead a structural anomaly of the acromium as the likely cause of the impingement. (Rec. Doc. 9-2, p. 123-28).

- A December 2012 lumbar MRI revealed mild lumbar spondylosis with no evidence of neural compression. (Rec. Doc. 9-2, p. 11).

- Records of December 2012 through March 2013 from Lafayette Chiropractic Physicians' Group for neck and back numbness and pain indicate a history of herniated disc and osteoarthritis. (Rec. Doc. 9-2, p. 3-10).

- University Health records from March 2012 through April 2013 show a history of right shoulder surgery (rotator cuff repair), back pain (described as chronic), knee pain, and tinnitus. (Rec. Doc. 9-2, p. 16-40).

- An April 2012 lumbar MRI revealed a stable L2-3 disc protrusion and worsening L5-S1 central disc protrusion with lateral recess narrowing. (Rec. Doc. 9-2, p. 179-80).

3

- A June 2012 lumbar CT scan revealed mildly abnormal spine curvature, non-specific, which could be due to pain, spasm, and/or positioning, with lumbar spondylosis. (Rec. Doc. 9-2, p. 32).

- In 2012 Claimant experienced severe grief over her mother's death for which she sought mental health treatment with the VA. (Rec. Doc. 9-3, p. 1006-15).

- A December 2012 lumbar MRI revealed mild lumbar spondylosis with no evidence of neural compression. (Rec. Doc. 9-2, p. 220).

- In 2013, Claimant underwent three lumbar epidural steroid injections at L3-4, performed by Dr. Kasarla at Anesthesiology and Pain Consultants. In September 2013, her lumbar exam showed moderate tenderness on the midline, L2 through L5, sciatic notch, SI joint, etc. She had no trigger point localization or radiation. Muscle strength was normal and her straight leg raise test was negative. She was positive for back pain bilaterally, and sciatic tension signs were negative. Her diagnoses were lumbago, unspecified thoracic or lumbosacral neuritis or radiculitis, and lumbosacral spondylosis without myelopathy. She was prescribed Flexeril, Lortab, and physical therapy. (Rec. Doc. 9-2, p. 49-97; Rec. Doc. 9-4, p. 740-88).

- VA records from December 2011 through October 2013 include a history of low back/lumbago pain dating back to at least 2009 and depression and insomnia since 2011. (Rec. Doc. 9-2, p. 98 et seq).

- Claimant had a VA visit in July 2013 for lumbar strain and degenerative arthritis of the spine, diagnosed in 2008. Physical examination showed functional loss with pain and tenderness. She had no muscle atrophy and dermatome testing, with positive straight leg raising tests. She had no radiculopathy. Her condition affected her ability to work in that she could not lift weights, stand or sit for long due to low back pain. She was referred for physical therapy. (Rec. Doc. 9-2, p. 113-21; 167).

- She treated frequently at the VA Clinic for low back pain. Dr. St. Cyr referred her for pain management. The records indicate that by October 2013, she had completed chiropractic care and water therapy which had been beneficial. She had one episode of her legs giving out. She had also been using the alpha stim and TENS unit. She was ambulating with a slow, antalgic gait with use of a cane and wearing a brace. The latter issue was apparently somewhat related

to left knee pain she experienced after a July 2013 fall. (Rec. Doc. 9-2, p. 129-36.). She had another fall in December 2013 due to her knee giving out. (Rec. Doc. 9-3, p. 890).

- An August 2013 lumbar MRI showed no significant disc bulge/herniation, neuroforaminal or spinal stenosis at any lumbar level. There was mild degenerative disc signal. (Rec. Doc. 9-2, p. 177-78).

- A September 2013 emergency room visit for ongoing back pain noted a history of multiple MRIs and a neurosurgery opinion from Houston VA that recommended no surgery because her complaints seemed to be musculoskeletal. An EMG done in April 2013 concluded she gave suboptimal effort, and the results were unremarkable with no signs of myelopathy, neuropathy or radiculopathy. She was wearing a back brace and using a cane. The back brace was issued by her VA doctor or physical therapist. (Rec. Doc. 9-2, p. 140-46; 155-56; 209; 702-04).

- Visits to Dr. Patrick Moore in December 2012 through August 2013 were for lumbar neuritis or radiculitis and lumbago, as well as insomnia due to the loss of her mother, and tinnitus. Each exam revealed normal physical findings with mild paraspinous tenderness. (Rec. Doc. 9-2, p. 194-208).

- A January 22, 2014 cervical spine MRI revealed at C6-7 a high intensity zone possibly indicating a radial tear of the annulus, but no significant disc bulge/herniation, neuroforaminal or spinal stenosis at any other level. The abnormality was described as minor. (Rec. Doc. 9-3, p. 53-54). A January 13, 2014 MRI of the brain revealed possibly posttraumatic scarring in the cerebrum and partially empty sella, both of which were described as minor abnormalities. (Rec. Doc. 9-3, p. 54-55).

- A February 2014 lumbar MRI revealed stable multilevel mild degenerative disc disease and spondylosis without significant foraminal, lateral recess or spinal canal stenosis at any lumbar level. (Rec. Doc. 9-3, p. 50-51).

- An October 2014 back conditions disability questionnaire completed by Dr. Jorge Belgodere-Bonilla for the VA indicates Claimant was diagnosed with degenerative disc disease, arthritis spondylosis with chronic lumbar strain, thoracolumbar spine associated with patellofemoral dysfunction of the right knee in 2009. She was also diagnosed with bilateral lower extremity

5

radiculopathy in 2014. She was referred for physical therapy rather than surgery after a surgical consultation. The physical findings showed pain preventing her from normal movement and decreased strength in her lower extremities (3/5 in the left; 4/5 in the right). She had a decreased sensory exam in the feet/toes due to L5 involvement. Other lumbar nerve roots were also involved. She was using a back brace to keep her stable and decrease pain and a cane to help with stability. Ultimately the completing physician concluded the new diagnosis of bilateral lower extremity radiculopathy demonstrated a progression of a service connected condition. He concluded that she was limited to sedentary work. (Rec. Doc. 9-2, p. 241-48; Rec. Doc. 9-4, p. 259).

- Physical therapy records from December 2013 through March 2014 noted that she rarely attended physical therapy since her December 2013 fall. As such, she had no significant improvement in function and continued with significant pain. (Rec. Doc. 9-2, p. 252-65). She also suffered from occasional ankle and knee pain. (Rec. Doc. 9-3, p. 762-67).

- The medical records also show an ongoing history of gastritis and IBS. A June 2014 endoscopy procedure showed a normal esophagus and diffuse area of chronic gastritis in the stomach for which anti-reflux measures were recommended. She was hospitalized in April 2014 for severe constipation. (Rec. Doc. 9-2, p. 266-280; 739-62. See also Rec. Doc. 9-3 generally).

- A September 25, 2014 letter from Claimant's treating physician, Dr. Mark St. Cyr, states that she is a service connected Veteran who is unable to do sedentary work, because she cannot get to the job, as she cannot bend, walk, stand, or sit without pain and cannot focus at work. She would not be a consistent or dependable employee due to her pain and regular medical appointments. Her physical condition was getting progressively worse, and her medications caused sedation and lack of focus. She had to use braces and a cane. (Rec. Doc. 9-2, p. 571).

- Claimant underwent a psychological evaluation with the VA in October 2014 with Dr. Gina Beverly. She reported having been divorced 15 years prior with an adult son. She experienced emotional and sexual abuse by her ex-husband. She had been diagnosed with somatoform disorder in 2009 by Dr. Blevins. She presented with prominent pain behavior and depressed mood. She reported military sexual trauma she experienced while serving in Honduras. She believed she had been drugged and had no memory of the event. She was really bothered by her physical limitations and being unable to work. Her

mood was poor, and she was worried about taking care of her family. She noted problems maintaining relationships. Her Global Assessment of Functioning (GAC) was 55. Dr. Beverly maintained a diagnosis for somatoform disorder and major depressive disorder. She recommended individual therapy and social work in the chronic pain group. (Rec. Doc. 9-3, p. 748-50).

- She slipped on a wet floor and landed on her right knee in October 2014. She went to the emergency room, where she was given cortisone and Marcaine injection and advised to resume physical therapy. (Rec. Doc. 9-3, p. 739-40; 745-46).

- In November 2014, the Department of Veteran Affairs concluded that she had 20% service connected disability for radiculopathy, left lower extremity, 10% served connection for radiculopathy right lower extremity, and 10% separate evaluation for left knee sprain. She was entitled to individual unemployability, special monthly compensation, and basic eligibility to Dependents' Educational Assistance, effective May 27, 2014. The evaluation of degenerative disc disease, arthritis/spondylosis with chronic lumbosacral strain, was continued as 40% disabling; chronic gastritis, peptic ulcer disease, GERD was evaluated as 10% disabling; and patellofemoral dysfunction of the right knee was evaluated as 10% disabling. The report notes that the VA examiner opined that her service connected lumbar condition prevented her from performing sedentary work as the condition causes pain. (Rec. Doc. 9-2, p. 563-70).

- Claimant participated in mental health group counseling with the VA due to major depressive disorder in January through May 2015. These visits focused on coping with pain. She also had diet counseling due to obesity. (Rec. Doc. 9-3, p. 425-68; 647-56).

- She went to the emergency room several times in 2015-2016 for ongoing back pain. (Rec. Doc. 9-2, p. 768-78; 798-801). In addition, extensive VA records between 2015 and 2017 note numerous visits for back pain, that she used a back brace, and that she walked with a cane. There was also an ongoing diagnosis of depression. (Rec. Doc. 9-3 generally). She also tried physical therapy, chiropractic treatment, and aquatic therapy. (Rec. Doc. 9-4, p. 122-31; 139; 231).

- A September 2015 physical therapy note indicates her range of motion was within normal limits for all limbs, but upon request for lumbar mobility, Claimant was self-limiting her trunk movements to <10 degrees in all planes despite ability to flex, sit, turn to look in a different direction, and bend over sideways to pick up an object without complaining, splinting or guarding. Her strength was 5/5 in all limbs. The therapist was unable to palpate any lumbar structures because she complained of hypersensitivity which caused her to cry out loudly when even lightly touched. She refused to touch her skin herself. (Rec. Doc. 9-3, p. 398-400).

- An October 2015 lumbar MRI revealed progression of degenerative changes at L5-S1 resulting in moderate to severe bilateral neural foraminal narrowing, right greater than left since February 2014 exam. (Rec. Doc. 9-2, p. 590-91).

- A nerve conduction study in March 2016 revealed sural latency prolongation which was not significantly changed from 2013. The study was otherwise negative without evidence of significant neuropathy or radiculopathy on either side. It was also noted that she had less than typical adult pain tolerance for discomfort of test. (Rec. Doc. 9-3, p. 316-17).

- A May 2016 lumbar MRI revealed a 1.3 cm right paracentral disc extrusion at L5-S1 with severe right neuroforaminal narrowing and moderate left neuroforaminal narrowing at L5-S1. (Rec. Doc. 9-2, p. 557). In May 2016, Dr. Scott Soleau at the NeuroMedical Center performed right L5-S1 microdiscectomy. (Rec. Doc. 9-4, p. 794-95). At her June 2016 follow up visit, she was doing dramatically better, was walking with a cane, and was very pleased with the result. She still had some radicular symptoms which were expected given the severity of nerve compression. (Rec. Doc. 9-4, p. 22). A July 2016 lumbar MRI revealed interval surgical procedure at L5-S1 with dorsal midline scarring and postsurgical related enhancement and stable appearance of moderate to severe left and severe right neural foraminal stenosis. There was minimal to mild multilevel degenerative changes throughout the lumbar spine at various levels that appeared similar to the most recent prior exam. (Rec. Doc. 9-2, p. 588-89). In her follow up visit with Dr. Soleau, she was developing radicular symptoms in her left leg, similar to that which she had experienced in her right leg prior to the surgery. Dr. Soleau opined the disc bulging found in the recent MRI was very small and he would endeavor to treat it nonoperatively. (Rec. Doc. 9-4, p. 66).

- An October 2016 lumbar MRI revealed improvement of neural foraminal stenosis at L5-S1, minimal to mild on exam and post-surgical related enhancement at L5-S1 appeared stable. (Rec. Doc. 9-2, p. 585-86). At her November 9, 2016 follow up at the NeuroMedical Center, she indicated her pain was completely gone. Dr. Soleau stated, "We definitely do not need to consider any surgical intervention at this time." She was to call on an as needed basis. (Rec. Doc. 9-4, p. 25).

- A January 2017 lumbar MRI revealed postoperative scarring and apparently new disc herniation on the right at L5-S1. (Rec. Doc. 9-2, p. 583-84).

- In March 2017, Dr. Soleau performed a repeat right L5-S1 microdiscectomy. (Rec. Doc. 9-4, p. 792-93). She went to the emergency room two days after the March 2017 surgery with low back pain. (Rec. Doc. 9-4, p. 3-7). A lumbar CT scan due to worsening back pain following her laminectomy revealed no acute lumbar spine osseous injury or change. (Rec. Doc. 9-2, p. 581; 821-28). Dr. Langston later performed spinal injections for continued pain. By July 2017, a right-sided ESI had provided significant relief, though the pain had migrated to the left side. Dr. Scott Soleau had reviewed her latest lumbar MRI which showed findings consistent with a recent right hemilaminectomy at L5-S1, with expected enhancing granulation tissue at the operation level with partial encasement of the central right S1 nerve root; no evidence of recurrent disc herniation or asymmetric left neural foraminal stenosis. There was bulging of annulus identified at L3-4 and L4-5 producing mild asymmetric left neural foraminal narrowing at both levels. (Rec. Doc. 9-2, p. 579-80; 815-18). Dr. Soleau did not see any disc herniation or compression of the left L5 or S1 nerve roots by any pathology. He opined that she should be treated with pain management interventions, not further surgery. There was some slight narrowing of the left L5-S1 foramen that he considered minimal. They would try aggressive nonoperative treatment through pain management before considering any further surgery, but if there was a future surgery, it would most likely be a fusion. (Rec. Doc. 9-2, p. 542-62; 845-910).

- VA records extensively document Claimant's ongoing complaints of back pain during 2016 and 2017. See generally Rec. Doc. 9-3. As of July 2017, she was reporting that her activities of daily living, physical activity and sleep were affected, but her appetite was not affected. (Rec. Doc. 9-3, p. 132-33).

- An August 2017 visit to University Medical Center for back and buttocks pain evidences that Claimant still had ongoing complaints despite the surgeries. She was diagnosed with acute exacerbation of chronic low back pain, given medication, and instructed to follow up with her neurosurgeon. (Rec. Doc. 9-2, p. 574).

- December 2017 cervical and brain CT scans revealed no acute abnormalities. (Rec. Doc. 9-5, p. 163-64).

- Claimant presented to the emergency room in December 2017 and again in January 2018 after falling. She had right neck, shoulder, elbow, low back, tailbone, and hip pain. There were no acute bony injuries, and all imaging studies were normal. (Rec. Doc. 9-2, p. 600-606; Rec. Doc. 9-4, p. 699-723).

- She had a February 2018 internal medicine follow up for frequent falling and continued complaints of back pain. Her physical exam showed normal range of motion, bilateral motor weakness (4/5 in left leg; 3/5 right leg), that she walked with a cane, and that she had pain with bilateral straight leg raises. Her February 2018 lumbar MRI revealed status post right-sided hemilaminectomy at L5-S1 with questionable granulation encasement of the transcending S1 nerve root and spondylotic changes greatest at L5-S1. She was assessed with post laminectomy syndrome/right leg weakness and referred for physical therapy. (Rec. Doc. 9-4, p. 724-32). A March 2018 cervical MRI revealed a narrow spinal canal complicated by mild disc herniation and central spinal stenosis at C6-7 and to a lesser degree at C5-6. (Rec. Doc. 9-4, p. 798).

- During 2018 and 2019, Claimant continued routine and emergent treatment for chronic and constant radiating spinal pain, knee pain, and at times shoulder pain. Imaging studies were normal. She again had spinal injections and a nerve conduction study, which was normal. She also continued with ongoing treatment for epigastric pain and thyroid issues and experienced episodes of tachycardia and irregular heartbeat. There were several noted falls during 2018. (Rec. Doc. 9-4, p. 817-962. See also Rec. Doc. 9-5, p. 37-59; Rec. Doc. 9-5, p. 163-72; 342-94). In 2018, she was fitted for a rollator, apparently at the request of her pain management doctor. (Rec. Doc. 9-4, p. 942).

- In November 2019, Claimant underwent a psychological evaluation at the request of her doctor, Dr. Martin Langston with the NeuroMedical Center. Dr. Peter Resweber, licensed clinical psychologist, concluded that there were no

psychological factors which caused undue concern about allowing her to make her own medical decisions. (Rec. Doc. 9-5, p. 731).

- A November 2019 lumbar MRI revealed prior right hemilaminectomy at L5-S1 and some enhancing fibrosis in the medial right L5-S1 foramen as well as posterolateral protrusion and asymmetric right posterolateral endplate spurring with some mild to moderate right foraminal and mild left foraminal narrowing. This was similar to findings in a prior study. The myelogram rendered similar results. (Rec. Doc. 9-5, p. 1628-30).

- In 2020, Claimant continued with significant back pain and frequent medical treatment. She continued to wear a back brace, use a cane, and again did physical therapy and tried a trial spinal cord stimulator. (Rec. Doc. 9-5, p. 654-94; 799-800). Her neurosurgeon, Dr. Soleau noted that she had gotten better after each prior decompression, but the neuropathic pain returned. She was not a good candidate for dorsal column stimulator. Dr. Soleau offered her an L5-S1 repeat decompression, that there was a 20% or greater chance that this surgery would not improve her symptoms. (Rec. Doc. 9-5, p. 593-94). Nevertheless, Claimant had a third surgery in July 2020, a L5-S1 transverse lumbar interbody fusion and pedicle screw fusion and decompression.

- As of September 2020, Dr. Soleau at the NeuroMedical Center felt that there had been excellent decompression from her surgery. She continued to have pain that went down the back of her leg to her knee. Dr. Langston did not feel that anything surgically could be done in the lumbar spine. He referred her to orthopedics for evaluation of hip pathology. (Rec. Doc. 9-5, p. 510-42). The hip evaluation in October 2020 by Dr. Joseph Hoffman was normal. He concluded she suffered from radicular pain with no intrinsic left hip disease. He observed that Claimant was an obese middle-aged woman walking gingerly with a cane in the left hand and no specific limp. (Rec. Doc. 9-5, p. 773). She continued to experience falls. (Rec. Doc. 9-5, p. 1400-16).

- During 2020, Claimant had ongoing cardiology complaints. (Rec. Doc. 9-5, p. 595-653). She was admitted in October 2020 for elective SVT ablation procedure which was unsuccessful and complicated by hypotension and hypoxia in the setting of bleed and protamine administration. She was admitted to the critical care unit, stabilized and discharged two days later. (Rec. Doc. 9-5, p. 766).

- Claimant often exhibited depression and complaints of extreme pain, despite a lack of objective findings that would support such complaints and despite taking strong narcotic pain medications such as Dilaudid. (See e.g. Rec. Doc. 9-4, p. 861-62). She underwent numerous tests of various body parts in the providers' efforts to discover the sources of her extreme pain, including a myelogram (a relatively routine diagnostic test) in December 2019, but it was such a bad experience for her, they had to give her Toradol in order to do the subsequent CT. (Rec. Doc. 9-5, p. 707).  At times, she was noted to exhibit "health care seeking behavior." (Rec. Doc. 9-4, p. 910-11). See also e.g. Rec. Doc. 9-4, p. 960-61, wherein Claimant presented to the emergency room and thereafter at the VA walk-in clinic after a fall in January 2018. She stated she was unable to use her right arm, hand, and shoulder due to the pain (rated 8/10) and the pain was getting worse; however, there was no swelling and her physical exam was "essentially benign." The records contain several other instances where Claimant reports to the emergency room or clinic with a complaint and nothing is found to be wrong. See e.g. Rec. Doc. 9-5, p. 110 wherein on May 28, 2019 she presented for a second opinion about possible tubes for her ears after reporting multiple ear infections and ear popping; however, she had normal audio testing and no objective signs of ear infections, with a normal exam. The VA also contains evidence that Claimant switched medical teams multiple times due to her dissatisfaction. See (Rec. Doc. 9-5, p. 760-61).

- The totality of the record amply supports that Claimant has obvious anxieties. She has an emotional support dog. (Rec. Doc. 9-5, p. 841). She again consulted Dr. Resweber for anxiety disorder, unspecified with the VA in January 2021. (Rec. Doc. 9-5, p. 1387-89).

- When Claimant continued to complain of significant pain after three surgeries, a spinal cord stimulator trial, and being maxed out on Lyrica and Cymbalta as well as receiving Dilaudid from the VA, in January 2021, Dr. Soleau opined there was nothing left to offer other than to continue with medication management. He mentioned that she was free to get second opinions. (Rec. Doc. 9-5, p. 1477).

- On May 10, 2021, one of Claimant's treating physicians, Dr. Martin Langston, provided a letter outlining her extensive medical treatment. He further advised she would need a Functional Capacity Exam in order to delineate work ability. (Rec. Doc. 9-5, p. 9-1, p. 14).

The ALJ initially found that Claimant was not disabled, because she was capable of performing sedentary work with certain physical restrictions. (Rec. Doc. 9-1, p. 175-79). Upon remand and after consideration of Claimant's mental impairments, the ALJ again found that Claimant was not disabled, because she was capable of performing sedentary work with the same physical restrictions. The ALJ specifically found that Claimant's mental impairments were non-severe. (Rec. Doc. 9-1, p. 30). Claimant now seeks reversal of the Commissioner's adverse ruling.

## <u>Analysis</u>

### A.    <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Id.* (citations omitted).

13

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173. A court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner. *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022. Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991). Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Wren v. Sullivan*, 925 F.2d at 126.

### B.    Entitlement to Benefits

The Disability Insurance Benefit program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. See 42 U.S.C. § 423(a).   See also *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019). Supplemental Security Income SSI provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. 42 U.S.C. § 1382(a)(1) & (2).   See also *Smith*

*v. Berryhill*, 139 S.Ct. at 1772. A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled if his physical or mental impairment or impairments are so severe that he is unable do his previous work and considering his age, education, and work experience, cannot participate in any other kind of substantial gainful work that exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. 42 U.S.C. § 1382c(a)(3)(B).

### C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work. 20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity by determining the most the claimant can still

do despite his physical and mental limitations based on all relevant evidence in the record. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 404.1545(a)(1). The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work. 20 C.F.R. § 404.1520(e).

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy. *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994). This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302. If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

D.    <u>**The ALJ's Findings and Conclusions**</u>

The ALJ determined at step one that Claimant did not engage in substantial gainful activity between the alleged onset date, September 25, 2014, through the date last insured, September 30, 2017. This finding is supported by substantial evidence in the record. (Rec. Doc. 9-1, p. 28).

At step two, the ALJ found that Claimant has the following severe impairments: degenerative disc disease, post laminectomy syndrome, residual effects of rotator cuff repair on the right, trochanteric bursitis of the left hip, sciatica, chondromalacia of the left knee, and obesity. (Rec. Doc. 9-1, p. 28-30). Claimant challenges this finding to the extent she alleges the ALJ failed to consider her mental impairments as severe.

At step three, the ALJ found that Claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Rec. Doc. 9-1, p. 30-31). Claimant challenges this finding regarding her mental status.

In assessing Claimant's residual functional capacity (RFC), the ALJ found that Claimant was capable of performing sedentary work subject to certain physical limitations. (Rec. Doc. 9-1, p. 31-35). Claimant challenges this finding.

At step four, the ALJ found Claimant was capable of performing her past relevant work as a receptionist and therefore did not reach step five. Claimant challenges this finding.

### E.    **The Allegations of Error**

Claimant alleges the ALJ erred as follows:

1) The ALJ failed to follow the Appeals Council's remand order by failing to properly consider Claimant's mental impairments.

2) The ALJ used the wrong regulations to evaluate Claimant's disability.

3) The ALJ failed to articulate a rational, medical, and evidentiary basis in rendering her RFC finding.

### F.    **Whether the ALJ properly considered Claimant's mental impairments.**

Following Claimant's appeal of the ALJ's first ruling, the Appeals Council remanded the claim back to the ALJ with the following instructions:

- The hearing decision does not properly evaluate the nature and severity of the claimant's major depressive disorder and somatoform disorder. The decision finds the opinion of the Gina Beverly, Ph.D., a board certified VA neuropsychologist, somewhat persuasive with the claimant's diagnosis of a somatoform disorder and major depression (Decision page 6), but the hearing decision does not find the impairments severe and does not provide a rationale for the paragraph "B" criteria using the special technique descri bed in 20 CFR 404.1520a and 416.920a. Further evaluation of the nature and severity of the claimant's mental impairments is needed.

Upon remand the Administrative Law Judge will:

- Evaluate the claimant's mental impairment in accordance with the special technique described in 20 CFR 404.1520a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c).

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and Social Security Ruling 85-16 and 96-8p).

(Rec. Doc. 9-1, p. 188).

On remand, the ALJ found that Claimant's mental impairments of an affective disorder and a somatoform disorder did not cause more than minimal limitation on her ability to perform basic mental work activities and was therefore non-severe. The Social Security Administration defines somatoform disorders as those "characterized by physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience." Further,

These disorders may also be characterized by a preoccupation with having or acquiring a serious medical condition that has not been identified or diagnosed. Symptoms and signs may include, but are not limited to, pain and other abnormalities of sensation, gastrointestinal

symptoms, fatigue, a high level of anxiety about personal health status, abnormal motor movement, pseudoseizures, and pseudoneurological symptoms, such as blindness or deafness.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

One court further explained somatoform disorders as follows:

The defining characteristic of such disorders is the manifestation of physical symptoms without determinable physiologic causes. *See Scott v. Shalala,* 43 F.3d 669, No. 94–50096, 1994 WL 725034, at *4 (5th Cir. Dec.19, 1994); *Rhodes v. Astrue,* No. 3:10–CV–0784–BF, 2011 WL 3820983, at *7 (N.D.Tex. Aug.26, 2011). Notably, despite the lack of physical evidence, "there is nothing imaginary or simulated about the patient's perception of his or her illness." *Rhodes,* 2011 WL 3820983, at *7 (quoting Edward Shorter, From Paralysis to Fatigue: A History of Psychosomatic Illness in the Modern Era IX (Free Press 1992). In fact, although "the multiple somatic complaints cannot be fully explained by any known general medical condition or the direct effects of a substance .... the unexplained symptoms in Somatization Disorder are not intentionally feigned or produced." *Id.* (quoting American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text rev. 2000) ("DSM") at 486).

*Craig-Cook v. Colvin*, No. 3:13-CV-1243-BF, 2014 WL 1386347, at *3 (N.D. Tex. Apr. 9, 2014).

The Code of Federal Regulations sets forth the following criteria for somatoform disorders:

A. Medical documentation of one or more of the following:

1. Symptoms of altered voluntary motor or sensory function that are not better explained by another medical or mental disorder;

2. One or more somatic symptoms that are distressing, with excessive thoughts, feelings, or behaviors related to the symptoms; or

20

    3. Preoccupation with having or acquiring a serious illness without significant symptoms present.

AND

    B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

    1. Understand, remember, or apply information (see 12.00E1).

    2. Interact with others (see 12.00E2).

    3. Concentrate, persist, or maintain pace (see 12.00E3).

    4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

      The Court agrees the ALJ failed to properly consider the impact of Claimant's somatoform disorder, which this Court finds is a severe impairment. Claimant was clinically diagnosed with somatoform disorder in 2009 and again in 2014 by Dr. Gina Beverly. (Rec. Doc. 9-3, p. 748-50). The ALJ did not rely upon—or even mention—Dr. Beverly's report, which the AC specifically instructed was persuasive evidence. (Rec. Doc. 9-1, p. 188). The ALJ therefore erred.

      The voluminous record of nearly 5,500 pages is replete with evidence of Claimant's manifestations of somatoform indicators: she had numerous and ongoing gastronomical complaints, including multiple endoscope procedures, during which no extraordinary findings were revealed. (Rec. Doc. 9-2, p. 266-280; 739-62; Rec. Doc. 9-3 generally). She often complained of earaches, and even sought ear tubes,

with no serious findings on exam. (See e.g. Rec. Doc. 9-5, p. 110). The record, as a whole, demonstrates that Claimant sought medical treatment routinely, if not excessively. She walked with a cane and described her pain as never alleviated, despite three surgeries, ongoing narcotic pain medications (including Dilaudid), and numerous treatment modalities including chiropractic treatment, physical therapy, injections, and numerous MRIs and other imaging studies, most of which revealed findings inconsistent with the extent of her perceived pain.

This Court has never seen a more obvious case of somatoform disorder. Nevertheless, the ALJ found Claimant's mental impairments were not severe, because paragraph B criteria were not met. The Court disagrees. The medical records show at least marked limitations in the abilities to interact with others and to adapt and manage herself. See e.g. Rec. Doc. 9-3, p. 748-50, wherein Dr. Beverly noted problems with maintaining relationships, and Rec. Doc. 9-5, p. 760-61 regarding Claimant's switching medical teams due to her dissatisfaction. Further, the extensive VA records demonstrate Claimant's frustration and impatience with her providers.

Claimant's persistent inability to handle even seemingly negligible amounts of discomfort supports that her ability to adapt and manage is at least markedly limited, even despite attending VA therapy for coping with pain. See e.g. Rec. Doc. 9-3, p. 398-400 and 9-5, p. 707. Also persuasive, is the fact that following each of her three surgeries, her neurosurgeon, Dr. Soleau, opined that no further surgeries

should be necessary. Yet, her providers did every conceivable treatment in their fruitless attempts to alleviate her pain, including multiple surgeries. Accordingly, the Court finds the ALJ erred in evaluating Claimant's mental impairments, and remand is warranted for a determination of whether Claimant is disabled in light of her diagnosed and amply evident somatoform disorder.

For the same reasons, the Court finds the ALJ erred in determining Claimant's residual functional capacity, which did not properly consider Claimant's mental impairments. See *Scott v. Shalala*, 43 F.3d 669 (5th Cir. 1994); *Bragg v. Comm'r of Soc. Sec. Admin.,* 567 F. Supp. 2d 893, 913 (N.D. Tex. 2008); *Craig-Cook v. Colvin*, No. 3:13-CV-1243-BF, 2014 WL 1386347, at *3 (N.D. Tex. Apr. 9, 2014).

### G.   **Whether the ALJ applied the proper standard.**

Claimant argues the ALJ applied the incorrect listing analysis to her claim. The ALJ analyzed the claim pursuant to Listing Impairment 1.15 regarding disorders of the skeletal spine resulting in compromise of a nerve root and Listing Impairment 1.18 regarding abnormality of a major joint in any extremity. (Rec. Doc. 9-1, p. 30). The Listing Impairments were effective on April 2, 2021 for both new and pending claims. Revised Medical Criteria for Evaluating Musculoskeletal Disorders, 85 FR 78164-01 (2020 WL 7056412). The ALJ issued the ruling on April 20, 2021. (Rec. Doc. 9-1, p. 37). Accordingly, this allegation of error is without merit.

23

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to re-evaluate Claimant's mental impairments in light of this Court's findings, Claimant's residual functional capacity, whether she is capable of performing her past relevant work, and whether she is disabled. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act ("EAJA").[1]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within

---

[1] See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[2]

Signed in Lafayette, Louisiana, this 15th day of September, 2022.

_____

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE

_____

[2]        See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).